IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Scott Alan Miller,          )
                             )     Civil Action No. 6:11-141-JMC-KFM
            Plaintiff,  )
                             )    **REPORT OF MAGISTRATE JUDGE**
        vs.                )
                             )
Michael J. Astrue,        )
Commissioner of Social Security,  )
                             )
          Defendant.  )
_____)

       This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

       The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

       The plaintiff filed an application for disability insurance benefits ("DIB") on October 15, 2007, alleging that he became unable to work on August 17, 2006. The application was denied initially and on reconsideration by the Social Security Administration. On August 5, 2008, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Arthur F. Schmitt, an impartial vocational expert, appeared on August 18, 2009, considered the case *de novo*, and on March 11, 2010, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on November 18, 2010. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.

2. The claimant has not engaged in substantial gainful activity since August 17, 2006, the alleged onset date (20 C.F.R. § 404.1571 *et seq.*)

3. The claimant has the following severe impairments: residual pain secondary to bilateral heel fractures, degenerative disc disease, carpal tunnel syndrome, major depressive disorder, attention deficit disorder, and social phobia (20 C.F.R. § 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of light work. Specifically, the claimant can perform the following work activity within an 8 hour work day: sit for 6 hours with normal breaks and stand for 2 hours, but no more than 30 minutes at a time, with an option to sit or stand and stretch at any time without leaving his work station; walk ½ a block; and, lift 20 pounds occasionally and 10 pounds frequently. The undersigned further limits the claimant's residual functional capacity to: pushing and pulling less than 20 pounds; avoiding ladders, ropes, and scaffolds; occasionally climbing stairs and ramps, but no longer than 2 hours of

2

an 8 hour day and no higher than 30 inches at a time; performing other postural activities occasionally; and reaching and using gross motor manipulation frequently, but not continuously. The claimant can maintain attention and concentration for 2 hours at a time; can interact with others but prefers to avoid concentrated interaction with the public; and can perform simple, routine tasks although he experiences a moderate limitation on detailed tasks.

6. The claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

7. The claimant was born on November 6, 1964, and was 41 years old, which is defined as a younger individual age 18-49, on the alleged onset date (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404. Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 16, 2006 through the date of this decision (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

The plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He

4

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform, despite the existence of impairments which prevent the return to past relevant work, by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there

is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).


## **EVIDENCE PRESENTED**[2]

The plaintiff was 45 years of age as of the date of the Commissioner's final decision. He has a 12th grade education and past work experience as a petroleum plant operator and a handyman. Following a work-related accident in August 2006, the plaintiff received an award of $236,764.10 from the South Carolina Workers' Compensation Commission in June 2007.

On December 1, 2005, the plaintiff presented to Palmetto Primary Care with tingling in his right hand, upper back, and right shoulder pain (Tr. 575). Cervical spine x-rays dated January 5, 2006, showed upper cervical straightening, which it was thought might have been due to position or spasm (Tr. 295). Mild upper cervical disc narrowing was noted. On January 11, 2006, the plaintiff was seen at Palmetto Primary Care with paresthesias in his right arm and hand (Tr. 573). Exam showed moderate tenderness in cervical spine. He was prescribed Flexeril, Lortab, and Voltaren Sodium (Tr. 574). An MRI of the plaintiff's cervical spine dated January 18, 2006, showed central disc protrusion at the C3-4 and C4-5 levels with indentation upon the spinal cord and mild central canal stenosis (Tr. 464).

The plaintiff saw Dr. Mike Tyler on February 23, 2006 (Tr. 487). He reported neck pain and numbness in both hands, greater on the right, lasting the past few months. He reported continuous posterior headaches, neck pain, and pain in the lower cervical spine that radiated to his shoulders. Dr. Tyler reviewed the plaintiff's MRIs. On exam, Dr.

---

[2]The medical evidence cited herein is primarily taken from the plaintiff's brief (pl. brief at 4-10). The Commissioner provided an extensive summary of the evidence (def. brief at 2-20); however, the Commissioner's citations to the record do not correspond to the page numbers in the transcript filed with the court.

Tyler observed range of motion to cause mild to moderate pain with rotation to the left and extension that tended to cause some pain radiating to his right arm (Tr. 488). Tinel's sign and phalen's test were mildly positive at the right wrist, negative on the left. Dr. Tyler opined that the plaintiff suffered from a combination of congenital cervical stenosis along with acquired cervical stenosis with spur and /or bulging disc. Dr. Tyler opined that the plaintiff's spinal condition might be connected to his headaches. He recommended steroid injections and prescribed Lortab.

On March 17, 2006, the plaintiff was referred to the Trident Surgery Center for a series of cervical epidural steroid injections (Tr. 300). He reported posterior neck pain located between his shoulder blades and associated with occasional right shoulder pain, right hand numbness, and occasionally headaches for the past five months. The plaintiff denied any arm weakness but reported neck pain rating 10/10. The plaintiff presented for a second epidural steroid injection on March 31, 2006, and reported that his previous injection had given him a dramatic improvement in symptoms but that this only lasted for a few days (Tr. 282). He reported for his third injection on April 14, 2006, and reported 99.9% relief of his pain (Tr. 270).

The plaintiff was seen by Dr. John Lucas of Charleston Neurology Associates on May 23, 2006 with symptoms suggestive of cervical myelopathy and cervical radiculopathy (Tr. 624). On June 12, 2006, the plaintiff saw Dr. Lucas again and reported taking as many as five Lortab per day (Tr. 623). He reported that a series of three epidurals resolved his neck pain entirely for three months before his pain returned. He was noted to have bilateral moderate carpal tunnels, right greater than left. He was given wrist braces to wear at night.

On June 22, 2006, the plaintiff told Dr. Tyler that the injections had helped his neck pain but wore off after about a month (Tr. 485). He reported continuing posterior headaches and numbness in his hands and occasionally in his right foot. On exam, range

of motion was "fairly full" but extension was found to produce pain. Dr. Tyler opined that the plaintiff might be suffering from compression of the thecal sac at C4-5 (Tr. 486). He described the plaintiff's relief from the injections as "good but temporary." He planned to start the plaintiff on Lyrica. An MRI of the plaintiff's cervical spine from June 28, 2006 showed degenerative changes most severe at the C5-6 level (Tr. 465-66).

On August 10, 2006, Dr. Tyler reviewed the plaintiff's MRIs and noted a bulging disc with some compression on the spinal cord at C3-4 and C4-5 (Tr. 484). Dr. Tyler felt that the plaintiff would probably need a fusion and discectomy at both levels. He made a recommendation for anterior cervical discectomy and fusion at C4-5 and C3-4.

The plaintiff was seen at Summerville Medical Center on August 17, 2006, following an accident at his place of work (Tr. 459). He reported that he was trying to pry loose something from a diesel truck when he slipped backwards, twisted around, and landed on his feet. He had immediate pain in both heels. He was brought to the emergency room and found to have bilateral calcaneal (heel) fractures. He complained of moderate to severe pain in both heels, worse on the right. He denied any numbness in the lower extremities, knees or hips. Exam at the time of admission revealed diffuse swelling and bruising around the right ankle and foot, and pain on attempting range of motion of the ankle. On the left, swelling over the foot and ankle region but no bruising and no pain on range of motion (Tr. 460). Motion in the hip and knee were normal. X-rays showed displaced calcaneal fractures bilaterally. The plaintiff was treated with splints, bed rest, and elevation of the lower extremities (Tr. 461). He was also placed on a PCA (patient-controlled analgesia) pump for pain control.

Bilateral foot and ankle x-rays dated August 17, 2006, showed bilateral comminuted, calcaneal fractures were present with displacement of fracture fragments greatest on the right (Tr.467). There was evidence of a non-displaced right navicular fracture in the right ankle. Lateral ankle soft tissue swelling was observed, greater on the

8

right. A CT scan dated August 18, 2006 confirmed the findings of prior imaging (Tr. 473). The plaintiff underwent surgeries for these fractures on September 7 and September 12, 2006 (Tr. 342-43).

A lumbar MRI dated August 24, 2007, showed multilevel degenerative disc disease greatest at L2-3 level where a broad right paracentral disc protrusion resulting in mild central canal stenosis was observed (Tr. 478). Left neural foraminal narrowing and mass effect upon the exiting left L4 nerve root at the L4-5 level were noted as was small disc protrusion eccentric to the left at the L5-S1 level with mild left neural foraminal narrowing.

A cervical MRI dated October 13, 2006, was largely unchanged from January and June 2006 findings. On October 24, 2006, Dr. Tyler reviewed the plaintiff's October 13 scan (Tr. 483, 491). He noted a small ventral disc bulging disc at C3-4 and C4-5 but stated that his condition was largely unchanged since January. He opined that the discs did appear to touch and flatten the spinal cord and should be removed. Dr. Tyler recommended treatment by a chronic pain specialist due to concerns about habituation to narcotic pain medication that the plaintiff had been taking consistently over a long period of time.

On January 9, 2007, Dr. Joel Cox noted that the plaintiff was doing "very well" in respect to his foot injuries (Tr. 333). Exam revealed minimal swelling, and Dr. Cox noted that the plaintiff was progressing well with weight bearing. He recommended that the plaintiff continue with activity and weight bearing to tolerance, continue physical therapy, and restricted activity at work, if available. Dr. Cox opined that the plaintiff would suffer from permanent work-related restrictions and would probably benefit from retraining to a more sedentary occupation. He released the plaintiff to work insofar as he should be allowed to sit down with his feet elevated. Dr. Cox did not feel that the plaintiff was at maximum medical improvement ("MMI").

9

On January 19, 2007, the plaintiff presented with bilateral hand numbness, right worse than left (Tr. 332). On exam, he exhibited a positive Tinel's sign and positive compression at the wrist on the right. He was given wrist splints to wear at night. He received injections to both carpal canals, and Dr. Brooker noted that carpal tunnel release ought to be considered.

On January 29, 2007, the plaintiff underwent an echocardiogram with yielded left ventricular ejection fraction of 78% (Tr. 611).

On February 8, 2007, Dr. Cox reported good progress with respect to the plaintiff's foot injuries (Tr. 331). He continued the restrictions on the plaintiff's activity at work and noted that the plaintiff would probably need retraining to enter a more sedentary occupation. The plaintiff received a cervical epidural steroid injection on February 28, 2007 (Tr. 390).

On March 26, 2007, Dr. Cox noted some discomfort and swelling over the lateral aspect of the plaintiff's foot and ankle, which he felt might be tendon irritation (Tr. 388-89). He instructed the plaintiff to continue to use an elastic support and a lace-up ankle support on a regular basis and to continue physical therapy. He opined that the plaintiff had probably reached MMI. He released the plaintiff to work with restricted walking, standing, climbing, bending, and stooping.

On March 29. 2007, Dr. Cox assigned the plaintiff an impairment rating of 36% to the right lower extremity and 36% to the left lower extremity secondary to calcaneal fractures (Tr. 388). He noted, "The probability is that he will continue to require medical treatment, rehabilitation bracing and probable surgery in the future and will be significantly limited in his level of activity which require him to stand or walk for extended periods of time or distances."

On May 10, 2007, Dr. Tyler noted that the plaintiff was taking approximately four doses of ten milligram Lortab per day for pain in his ankles (Tr 481). The plaintiff

reported pain in his neck, especially when lying down at night, which Dr. Tyler felt was probably muscular. Dr. Tyler recommended conservative treatment and opined that the plaintiff's symptoms could be related to small disc bulges. The plaintiff was not a candidate for cervical fusion surgery. Dr. Tyler referred the plaintiff to Dr. Nolan for evaluation and treatment for chronic pain with possible epidural steroid injections.

The plaintiff was seen at the Trident Pain Center from May 16, 2007, to September 28, 2007 (Tr. 511-547). At his initial exam on May 16, 2007, the plaintiff was noted to have moderate pain in the entire cervical paraspinous musculature into the bilateral trapezius muscles to the shoulder to palpation, and on range of motion, palpable paraspinous myospasms were present. He was assessed to suffer from cervical facet arthropathy and myofascial pain and was referred for neuromuscular stimulator and to a Wellness program. His treatment included trigger point injections (Tr. 535) from which he reported moderate relief (Tr. 531).

On June 8, 2007, Dr. Tyler reviewed a May 12, 2007, cervical MRI (Tr. 556) and found no significant change (Tr. 480). He reiterated that the plaintiff was not a candidate for surgery given his ankle problem and current narcotic pain medication. He recommended further conservative treatment for neck pain.

On July 16, 2007, Dr. Cox noted continued improvement in regards to the plaintiff's foot and heel pain (Tr. 434). Celebrex was thought to be helping, but Dr. Cox requested that Dr. Nolan put the plaintiff on a trial of medications to replace his Lortab.

X-rays of lumbar spine dated August 14, 2007, showed severe lumbar spondylosis, probable spinal stenosis, and mild retrolisthesis at L2-3 and L3-4 and mild anterolisthesis at L4-5 (Tr. 626).

An August 24, 2007, MRI of the lumbar spine showed multilevel degenerative disc disease greatest at L2-L3 level where there was a broad right paracentral disc protrusion resulting in mild central canal stenosis (Tr. 559). Left neural foraminal narrowing

and mass effect upon the exiting left L4 nerve root were observed at the L4-5 level. Small disc protrusion eccentric to the left at the L5-S1 level with mild left neural foraminal narrowing was also noted.

On September 11, 2007, Dr. Tyler noted degenerative changes at L2-3, but an overall improvement in the plaintiff's neck pain after several injections (Tr. 480).

On October 9, 2007, exam at Palmetto Primary Care showed positive straight leg raises and radicular pain (Tr. 609).

On October 26, 2007, the plaintiff saw Dr. Shailesh Patel for an initial evaluation and consultation for treatment options in regards to pain complaints (Tr. 650-53). The plaintiff reported that his worst pain was in his heels, which was 8/10 most days and described as deep pressure and an aching sensation. The plaintiff reported neck and back pain that radiated to his legs causing sharp, burning pains. On exam, Dr. Patel noted decreased sensation to light touch in the bilateral L4, L5, and S1 distributions in both lower extremities. Waddell signs were negative. Dr. Patel's assessment included chronic bilateral heel pain secondary to history of calcaneal fractures, chronic low back pain, chronic neck pain, chronic neck pain, cervical DDD, lumbar DDD, lumbar and cervical mysofascial pain syndrome. He noted that the plaintiff reported relief with Lortab, but no lasting benefit from epidural steroid injections. He suggested a plan to combine a long-acting pain medication with short term meds to be used for breakthrough pain. The plaintiff signed a pain contract and was prescribed Lortab and Ultram.

Dr. Patel's assessment and examination findings were largely the same on November 21, 2007 (Tr. 698-99). He noted that the plaintiff had not responded to Ultram and recommended MS Contin, 15mg. On December 13, 2007, Dr. Patel noted that the plaintiff was unable to tolerate MS Contin secondary to increased sedation (Tr. 697). Exam and impression were unchanged. Dr. Patel prescribed Methadone (Tr. 695)

On January 9, 2008, the plaintiff reported to Dr. Patel that Methadone had initially helped, but felt his pain was returning (Tr. 695). Dr. Patel increased his Methadone prescription and added Lyrica. On March 6, 2008, the plaintiff reported that his medications wore off at the end of the day (Tr. 691). Exam was unchanged except lower extremity testing was positive for facet loading bilaterally (Tr. 690). Assessment and medications were unchanged except that Dr. Patel recommended a trial of medial branch blocks for the facet syndrome (Tr. 689). Dr. Patel continued to monitor the plaintiff's medications throughout 2008 (Tr. 685-689).

On February 9, 2009, Dr. Gregory Niemer of Lowcountry Rheumatology examined the plaintiff and found multiple trigger points consistent with fibromyalgia (Tr. 735).

The plaintiff saw Dr. Mark Beale of Charleston Psychiatric Associates on April 20, 2007 (Tr. 567). Dr. Beale's assessment included major depressive disorder, attention deficit disorder, and social phobia/panic (Tr. 567). The plaintiff's mood and affect were normal, but he reported irritability when in pain. He was prescribed Adderal, Ambien, and Effexor. On May 18, 2007, his mood had improved, and he was noted to feel "pretty good."

On July 13, 2007, Dr. Beale noted that the plaintiff's affect was anxious and that his mood was low and irritable (Tr. 566). He reported anxiety, sadness, hyper vigilance, and crying spells. He was compliant with medications but felt that his Effexor had stopped working. On July 11, 2008, Dr. Beale maintained his diagnoses from before and started the plaintiff on Trazadone (Tr. 730). On February 18, 2009, he wrote:

> I am [the plaintiff's] treating psychiatrist and have seen him for medication management visits in my office since November 2003. He is treated for major depression and panic disorder. These were significantly worsened after a work-related injury which led to chronic pain in August 2006. He is unable to work due to pain and depression and side effects of medications which he will need chronically.

13

(Tr. 728). On May 7, 2009, Dr. Beale noted that the plaintiff's pain was increased, and the plaintiff reported that his depression was recurring (Tr. 724). On June 15, 2009, Dr. Beale noted that Mr. Miller was isolating himself and suffered from worsening mood (Tr. 722). Diagnoses were as before.

On March 28, 2007, Jean Smolka, M.D., a State agency physician, determined that the plaintiff retained the physical residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit about six hours in an eight-hour workday; climb and crawl occasionally; balance, stoop, kneel, and crouch frequently; and perform work not requiring more than frequent gross manipulation with the upper extremities bilaterally, more than occasional overhead reaching in all directions with the right upper extremity, or more than occasional operation of foot controls with the lower extremities bilaterally; and that he had no visual, communicative, environmental, or other manipulative limitations (Tr. 391-98).

On May 7, 2007, Jeffrey Vidic, Ph.D., a State agency psychologist, determined that the plaintiff had no significant limitations in his abilities to remember locations and work-like procedures, understand, remember, and carry out short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others; and that

14

he had moderate limitations in his abilities to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. 415-32).

Dr. Vidic concluded that the plaintiff had the mental residual functional capacity to follow rules and remember simple one or two-step instructions; attend to simple tasks for two hours at a time 40 hours weekly without significant interference from psychiatric symptoms; make simple, work-related decisions and respond to minor changes in work routine with minimal supervision; perform work in the presence of others not requiring working with the public or coordinating closely with others; accept supervision and feedback regarding job performance; make simple plans; set simple goals; avoid common workplace hazards; use public transportation; and maintain appropriate appearance and hygiene (Tr. 415-32).

On December 5, 2007, William Cain, M.D., a State agency physician, determined that the plaintiff retained the physical residual functional capacity to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit about six hours in an eight-hour workday; push/pull within his lifting capacity; climb ramps/stairs, balance, stoop, kneel, crouch, and crawl occasionally; and perform work not requiring climbing ladders/ropes/scaffolds or more than frequent fingering bilaterally; and that he had no visual, communicative, environmental, or other manipulative limitations (Tr. 654-61).

On February 1, 2008, Cashton B. Spivey, Ph.D., a consultative licensed clinical psychologist, examined the plaintiff. The plaintiff reported experiencing depression and headaches and currently taking pain, anticonvulsant, antidepressant, sedative, and other medications, but denied experiencing memory deficits and anxiety. He also reported a history of twice being arrested for "driving under the influence" and current daily alcohol

15

consumption. He further reported cooking, performing general cleaning, reading, watching sports, driving an automobile, and transporting his children to school, and being capable of caring for his personal needs independently and performing simple arithmetic calculations (Tr. 662-65).

Examination revealed that the plaintiff was oriented, appropriately dressed and groomed, and cooperative with testing, and demonstrated normal mental functioning and absence of significant cognitive impairment, including intact language skills, satisfactory fund of information, estimated average to low average intellectual functioning, and the abilities to perform serial 7s, recall two of three objects after five minutes, and follow a three-step command. Dr. Spivey diagnosed anxiety and depressive disorders, economic problems, and physical diagnoses and resultant symptoms (by report) (Tr. 662-65).

On February 22, 2008, Judith Von, Ph.D., a State agency psychologist, determined that the plaintiff had no significant limitations in his abilities to remember locations and work-like procedures, understand, remember, and carry out short and simple or detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others; and that he had moderate limitations in his abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at

16

a consistent pace without an unreasonable number and length of rest periods and interact appropriately with the general public. Dr. Von concluded that the plaintiff had no cognitive limitations and had the mental residual functional capacity to attend work on a regular basis, sustain a typical work routine, and interact appropriately with others (Tr. 666-83).

On June 5, 2008, Cal VanderPlate, Ph.D., a State agency psychologist, determined that the plaintiff had no significant limitations in his abilities to remember locations and work-like procedures, understand, remember, and carry out short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others; and that he had moderate limitations in his abilities to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, and interact appropriately with the general public. Dr. VanderPlate concluded that plaintiff had the mental residual functional capacity to understand and remember simple directions, carry out simple tasks, maintain attention and concentration for at least a two-hour period during an eight-hour day, complete a normal workweek, relate to supervisors and coworkers, deal

17

appropriately with criticism, manage stress, adjust to a task setting, and deal with normal changes (Tr. 703-20).

At his hearing on August 18, 2009, the plaintiff testified that he sustained work-related injuries in August 2006 for which he received a workers' compensation award. He also testified that he experienced neck and back pain and bilateral foot pain and numbness for which he took medication that was effective without side effects. He further testified that he "got depressed." He additionally testified that he rated his pain as at times a 10 plus on a scale of one to 10, with 10 being worst. The plaintiff stated that he attended his children with difficulty, performed household chores with difficulty, and drove an automobile. He also stated that he could lift 30 to 40 pounds, sit two hours at a time, stand one to three hours at a time, walk 45 minutes to one hour, read, write, add, and subtract, get along and work with others, understand and follow instructions, and keep his mind on what he was doing if he was not hurting (Tr. 35-45).

Arthur F. Schmitt, Ph.D., a vocational expert, testified that, considering an individual of the plaintiff's age, education, and RFC who could to read, write, add, and subtract; interact with others; lift 20 pounds occasionally and 10 pounds frequently; sit six hours and stand two hours in an eight-hour day (but standing no more than 30 minutes at a time or walking more than half a block, with the option of standing without leaving his workstation), push/pull within his lifting capacity; occasionally climb stairs and ramps, but no more than two hours a day 30 minutes at a time; occasionally perform other postural activities; frequently reach and perform gross manipulations; and perform work not requiring use of ladders/ropes/scaffolds, maintenance of attention and concentration more than two hours at a time, or conduction of more than simple, routine tasks or limited detailed tasks, jobs existed in the regional and national economies such an individual could perform. He

cited the unskilled sedentary[3] occupations of surveillance system monitor, telephone quotation clerk, and weight inspector/tester as examples and provided the incidence of these jobs in the regional and national economies (Tr. 49-52).

## ANALYSIS

The plaintiff was 41 years old on his alleged disability onset date and was 45 years old as of the date of the ALJ's decision.  The ALJ found that the plaintiff had the RFC to perform less than a full range of light work.  She further determined that the plaintiff could not perform his past relevant work but would be able to perform jobs that exist in significant numbers in the national economy, including the sedentary occupations of surveillance system monitor, weight inspector, and telephone quote clerk. The plaintiff argues that the ALJ erred by (1)  failing to properly consider the combined effect of his multiple impairments; and (2)  failing to properly consider the opinions of his treating physicians.

### *Combined Effect of Impairments*

The plaintiff first argues that the ALJ failed to properly consider the combined effect of his multiple impairments.  This court agrees.

When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability.  Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).  It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)). The ALJ's duty to consider

---

[3]Sedentary work involves sitting six hours and walking and standing two hours in an eight-hour day and lifting no more than 10 pounds at a time. *See* 20 C.F.R. § 404.1567(a) (citing SSR 83-10).

the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. § 404.1523.

Here, at step two of the sequential evaluation process, the ALJ found that the plaintiff has the following severe impairments: residual pain secondary to bilateral heel fractures, degenerative disc disease, carpal tunnel syndrome, major depressive disorder, attention deficit disorder, and social phobia (Tr. 15). The ALJ found that the plaintiff's gastroesophageal reflux disease ("GERD"), migraine headaches, hypertension, fibromyalgia, and alcohol dependence were not severe impairments (Tr. 15-16). The ALJ then went through a brief listing analysis in which she summarized the criteria of the relevant listings and concluded that the plaintiff did not meet any of them (Tr. 16-18).[4] Next, in her RFC assessment, the ALJ provided no discussion of whether the plaintiff's nonsevere

_____

[4] The ALJ summarily stated that the plaintiff does not have "an impairment or combination of impairments that meets or medically equals the criteria of one of the listed impairments" (Tr. 16), which is identical to the ALJ's decision considered in *Lemacks v. Astrue*, No. 8:07–2438–RBH–BHH, in which the court stated:

> The ALJ's decision regarding the combined effects of the plaintiff's impairments, in this case, is identical to that in *Walker*. In a single conclusory statement the ALJ states that "the claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1...." The Fourth Circuit, in *Walker*, expressly held that such a "finding in itself, however, is not sufficient to foreclose disability."
>
> ...
>
> The Court is aware that the structure of the ALJ's analysis in this case is not uncommon. Most decisions reviewed by the Court profess to consider the combined effects of a claimant's impairments, while actually analyzing each impairment separately. The ALJs may, in fact, be considering the combined effect, but analysis reflecting such consideration is seldom expressly included. *Walker* requires adequate explanation and evaluation; in its absence, judicial review cannot be had. These decisions commit precisely the error rejected in *Walker*, and when a claimant brings them to the attention of the Court, they cannot be ignored. As recently as this year, this district has reaffirmed its commitment to enforcing the requirements of *Walker* that the ALJ make express his treatment of the combined effects of all impairments.

2008 WL 2510087, at *3–4 (D.S.C. May 29, 2008) (citations omitted), adopted by 2008 WL 2510040 (D.S.C. 2008).

impairments impacted his RFC or whether she considered them in combination with the plaintiff's severe impairments (*see* Tr. 18-23).

Upon review of the ALJ's decision, this court concludes the ALJ failed to properly discuss the combined effects of the plaintiff's impairments, thereby violating 20 C.F.R. § 404.1523, which provides as follows:

> Multiple Impairments. In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see § 404.1520).

*Id.*

Accordingly, this case should be remanded for the ALJ to consider all of the plaintiff's impairments, both severe and nonsevere, in combination, as discussed above.

**Opinion Evidence**

The plaintiff next argues that the ALJ failed to properly consider the opinion evidence of several physicians. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not

medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

First, the plaintiff argues that the ALJ did not explain her rejection of Dr. Beale's opinion of his chronic need for medication and the severe side effects thereof. On February 18, 2009, Dr. Beale opined:

> I am [the plaintiff's] treating psychiatrist and have seen him for medication management visits in my office since November 2003. He is treated for major depression and panic disorder. These were significantly worsened after a work-related injury which led to chronic pain in August 2006. He is unable to work due to pain and depression and side effects of medications which he will need chronically. We are currently adjusting his medication in order to bring his depression under control.

(Tr. 728). The ALJ rejected the opinion, stating as follows: "The undersigned has given little weight to this opinion as it is inconsistent with the weight of the medical evidence regarding

the claimant's pain and the claimant's own report that his depression did not affect his ability to work as long as he was in treatment" (Tr. 21). This court agrees that the ALJ failed to adequately explain her rejection of Dr. Beale's opinion of the plaintiff's chronic need for medication and the severe side effects thereof. Upon remand, the ALJ should be instructed to explain her reasoning.

Next, the plaintiff argues that the ALJ erred by drawing a negative inference from the fact that Dr. Cox did not opine that the plaintiff was unable to work. This allegation of error is without merit. The ALJ specifically noted Dr. Cox's opinions that (1) the plaintiff would have permanent weight restrictions and would benefit from retraining to a more sedentary occupation; (2) the plaintiff would be significantly limited in his ability to stand or walk for extended periods of time or distances; (3) the plaintiff could return to work with restricted standing, walking, climbing, bending, and stooping. The ALJ gave "the opinions of Dr. Cox significant weight as the claimant's treating orthopedist." The ALJ further noted, "Although Dr. Cox suggested restrictions to claimant's work, he did not opine that the claimant was unable to work" (Tr. 21).

The plaintiff argues, "The ALJ cannot have it both ways - ignoring statements that a claimant cannot work while drawing negative inferences when those same statements are not made" (pl. brief at 13). However, as noted by the Commissioner, Dr. Cox, in fact, placed certain limitations on the plaintiff's activity (Tr. 333, 434) that were compatible with the sitting capacity the ALJ found the plaintiff retained and the lifting capacity the plaintiff himself reported. This court sees no error in the ALJ's consideration of Dr. Cox's opinions.

The plaintiff argues that the ALJ erred in failing to evaluate the opinion Dr. Patel, who noted that injection therapy had been only partially and temporarily effective for the plaintiff (Tr. 651), before she concluded that "medications have been relatively effective in controlling the claimant's symptoms" (Tr. 21). On October 26, 2007, Dr. Patel saw the

plaintiff for an initial evaluation and stated as follows in his treatment notes, "[The plaintiff] has had multiple epidural steroid injections which have failed to provide any lasting pain relief in the neck and therefore, further epidural steroid injections are not indicated at this time" (Tr. 651). Dr. Patel went on to opine that because the plaintiff had "multiple pain generators . . . it is more likely that this is a patient who will require long term chronic opiate medications to control his pain. Therefore, I believe it would be best for the patient to start a long acting pain medication with short acting pain medications for breakthrough pain" (Tr. 651).

The ALJ discussed Dr. Patel's treatment notes in which he stated on several occasions that Methadone and Lortab helped the plaintiff's pain (Tr. 20). This court sees no error in the ALJ's consideration of Dr. Patel's opinion in her conclusion that medications had been "relatively effective" in controlling the plaintiff's pain.

The plaintiff next argues that the ALJ erred in failing to mention Dr. Tyler's conclusion that the plaintiff was not a good candidate for surgery before she concluded that "medications have been relatively effective in controlling the claimant's symptoms" (Tr. 21). In May 2007, Dr. Tyler stated, "It is my recommendation that [the plaintiff] treat this conservatively. . . . I think to undergo a two-level anterior cervical fusion for his symptoms and his x-ray findings at this time would not be a good idea" (Tr. 481). In June 2007, Dr. Tyler again stated, " There is really no change in his cervical MRI and I do not feel that surgery would be in his best interest . . . . I think his neck should be treated conservatively" (Tr. 480). In September 2007, Dr. Tyler stated:

> We are going to send him for some back rehab and see how he does. . . . If he does not get better, or if his symptoms worsen, and he starts having painful radiculopathy, then he may be a candidate for decompression and possible fusion. At the present time, however, I would prefer to treat him conservatively if at all possible.

(Tr. 480).

24

The ALJ noted specifically that Dr. Tyler recommended conservative treatment of the plaintiff's neck (Tr. 19). The ALJ further noted that the plaintiff received injections in his neck, and Dr. Tyler's office notes indicated those injections were successful (Tr. 19; *see* Tr. 480). Based upon the foregoing, this court agrees with the Commissioner that the ALJ did not err in her consideration of Dr. Tyler's opinion in her conclusion that medications had been "relatively effective" in controlling the plaintiff's pain.

Lastly, the plaintiff argues that while the ALJ assigned little weight to Dr. Niemer's opinion that the plaintiff suffered from fibromyalgia, she failed to address how Dr. Niemer's finding supported the plaintiff's complaints of pain and fatigue (Tr. 22). Dr. Niemer saw the plaintiff on February 9, 2009, upon referral from Dr. Patel. He opined that fibromyalgia was the "most likely culprit" for the plaintiff's "history of progressive myalgias and arthralgias, with hyperalgesia and severe fatigue associated with poor quality sleep" (Tr. 735). The ALJ found as follows with regard to Dr. Niemer's opinion: "Dr. Niemer opined that the claimant's symptoms of pain and fatigue were likely caused by fibromyalgia. However, the record does not indicate a final diagnosis of fibromyalgia. . . . As such, the undersigned assigns little weight to this opinion" (Tr. 22; *see* Tr. 16). The plaintiff does not contend that the ALJ should have found his fibromyalgia to be a severe impairment (pl. reply at 2), but argues simply that the ALJ should have considered Dr. Niemer's opinion in addressing the plaintiff's subjective complaints of pain and fatigue. This court agrees.

Upon remand, the ALJ should be instructed to evaluate the opinion evidence in accordance with the foregoing.

## CONCLUSION AND RECOMMENDATION

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/ Kevin F. McDonald
United States Magistrate Judge

February 14, 2012
Greenville, South Carolina